Michael C. McKay (023354)
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 117
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Facsimile: (480) 348-3999
Email: mmckay@mckaylaw.us
[Additional counsel identified below]
*Attorneys for Max Federman*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Max Federman, derivatively on behalf of First Solar, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Mark Widmar; Michael J. Ahearn; Richard D. Chapman; Anita Marangoly George; George A. Hambro; Molly E. Joseph; Craig Kennedy; Lisa A. Kro; William J. Post; Paul H. Stebbins; Michael T. Sweeney; and Norman L. Wright, <br><br> Defendants, <br><br> and <br><br> First Solar, Inc., <br><br> Nominal Defendant. | Case No. _____ <br><br> **Verified Stockholder Derivative Complaint** <br><br> **Jury Trial Demanded** |

Plaintiff, Max Federman, by his undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant First Solar, Inc. ("First Solar" or the "Company") against the members of the Company's Board of Directors for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of First Solar conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a stockholder derivative action brought against the members of the First Solar Board of Directors (the "Board") for their violations of fiduciary duties and other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.     First Solar is a solar panel manufacturer that develops, finances, engineers, constructs, and operates grid-connected solar power plants worldwide. The Company's Systems segment develops sites with fully operational solar power plants, sells the sites to customers, and maintains and services those sites. Within the Systems segment, First Solar's Project Development division is responsible for acquiring, developing, and selling new sites.

3.     At the end of 2016, the Company announced that it was employing new and improved systems modules, *i.e.*, the Series 6 modules, which the Company touted

as more energy and cost-efficient, with increased capacity. The Company represented that the new modules would generate 460 watts per module and would result in a 40% reduction in cost per watt.

4.   Over the next several years, the Company and the Individual Defendants represented in press releases, public filings, and conference calls with financial analysts and investors, that the transition to the new modules was successfully proceeding according to plan and that the Company was meeting its cost reduction and performance targets for the Series 6. The Company also touted the strength of its Project Development business.

5.   In January 2020, however, Barclays published an investigative report on First Solar revealing that the Company misled the financial markets regarding the projects still in development in the Project Development division and that, concealed by First Solar, is the fact that its market share had *declined by 80%* and that the Company's Project Development business was failing, with only a few new projects added to the pipeline in 2019.

6.   In February 2020, seeming to corroborate much of the Barclays report, First Solar disclosed the sale of its Project Development business. Defendant Mark Widmar, the Company's Chief Executive Officer ("CEO"), admitted that First Solar had not only failed to achieve its efficiency goals for the new modules, only barely achieving 430 watts per module, but also missed its financial guidance for 2019.

7.   In the wake of the news of the Company's failure to meet its Series 6 efficiency and performance goals, the sale of the Project Development division, and the missed guidance, the Company's stock dropped nearly 15% in one day.

8.   Following the precipitous decline in the Company's stock, a securities class action lawsuit was filed by aggrieved investors against the Company, Defendant Widmar, and several other First Solar executives (the "Securities Class Action").  As

such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers.

9.     The Securities Class Action complaint contains reports from several confidential witnesses that worked for First Solar describing undisclosed recurring issues with the Series 6 modules, including that they suffered from faulty wiring resulting in electrical fires that led to system outages, consistently failed to generate the required wattage output to meet the Company's contractual commitments, and that inadequate shipping resulted in broken units that needed to be replaced. Indeed, the Securities Class Action complaint reports that First Solar was forced to pay liquidated damages to some customers because it could not meet its contractual obligations.

10.     Confidential witnesses also reported that the Individual Defendants knew about the recurring problems with the new modules and the decline of the Project Development division because these topics were discussed at town hall meetings led by Defendant Widmar and other First Solar executives. Field reports describing the defective units were transmitted to the Board. However, the Individual Defendants chose to ignore these red flags, failing to take action to ensure that the Company had effective internal controls, corporate governance practices, and disclosure procedures.

11.     As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, First Solar has sustained substantial damages and irreparable injury to its reputation.  Through this action, Plaintiff seeks to recover for the Company its damages and remediate the internal control weaknesses that plague First Solar.

12.     Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, First Solar will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.      JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.

15.      The Court has jurisdiction over each Defendant. First Solar does business in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice. The Individual Defendants, as corporate officers and/or directors of First Solar, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.      This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

17.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the wrongs took place in this District, Defendants transact business in this District, and Defendants' actions have had an effect in this District.

## III.     PARTIES

### a.      Plaintiff

18.      Plaintiff, Max Federman, has held stock in First Solar at all times relevant hereto. Plaintiff is a citizen of Oklahoma.

b.      **Defendants**

i.      **Nominal Defendant First Solar, Inc.**

19.     Nominal defendant First Solar is a company duly incorporated under the laws of the State of Delaware.  Its principal executive offices are located at 350 West Washington Street, Suite 600, Tempe, Arizona 85281.  First Solar is a global provider of photovoltaic ("PV") solar energy solutions and engages in the development, financing, engineering, construction, and operation of PV power plants.   First Solar's common stock trades on the Nasdaq Stock Market under the symbol "FSLR."

ii.     **Individual Defendants**

1.      **Defendant Widmar**

20.     Defendant Mark Widmar ("Widmar") has been the CEO and a director of First Solar since July 2016.

21.     Defendant Widmar joined First Solar in 2011 as Chief Financial Officer ("CFO") and also served as the Company's Chief Accounting Officer from February 2012 through June 2015. Widmar is a citizen of Arizona or Ohio.  As of March 31, 2022, Widmar beneficially owned 127,748 shares of common stock.

22.     Over the last two fiscal years, First Solar paid Widmar the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $900,309 | $4,699,945 | $930,660 | $11,600 | $6,542,454 |
| 2020 | $900,000 | $6.000,023 | $1,460,250 | $11,400 | $8,317,673 |

2.      **Defendant Ahearn**

23.     Defendant Michael J. Ahearn ("Ahearn") is the Chairman of the Board, is a member of the Technology Committee, and has served as a director of First Solar since

2000. Defendant Ahearn previously served as interim Chief Executive Officer ("CEO") from October 2011 to May 2021 and as CEO from August 2000 to September 2009.  As of March 31, 2022, Ahearn owned 144,391 shares of common stock. He is a citizen of Arizona. Ahearn co-founded an equity investment/venture capital company called True North Partners, eventually changing the company's name to JWMA Partners ("JWMA"). In 2011, Ahearn started a successor venture capital firm called True North Venture Partners, L.P. ("True North Venture").

24.     Over the last two years, First Solar paid Ahearn the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $150,000 | $235,221 | $385,221 |
| 2020 | $150,000 | $235,078 | $385,078 |

### 3.     Defendant Chapman

25.     Defendant Richard D. Chapman ("Chapman") has served as a First Solar director since 2012.  He is a member of the Audit Committee and the Compensation Committee. As of March 31, 2022, Chapman beneficially owned 30,988 shares of common stock. Defendant Chapman is a citizen of Arkansas or Florida. Chapman serves as an advisor to Walton Enterprises, Inc. ("Walton Enterprises"), where he has worked since 1983, most recently as Chief Financial Officer ("CFO") of the company. Chapman oversaw all aspects of the Walton Family Office in Arkansas. Chapman serves on the board of the Walton Family Charitable Support Foundation. Chapman was previously a member of JWMA and the Board of Managers of First Solar Holdings, LLC before the Company went public. Chapman is on the board of Arvest Bank Group.

26.     Over the last two years, First Solar paid Chapman the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $100,000 | 160,176 | $260,176 |
| 2020 | $100,000 | 160,186 | $260,186 |

#### 4. Defendant George

27.     Defendant Anita Marangoly George ("George") has been a First Solar director since 2021.  She is a member of the Nominating and Governance Committee and Technology Committee.

28.     As of March 31, 2022, George beneficially owned 1,220 shares of common stock. Defendant George is a citizen of Canada.

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $50,000[1] | 80,100 | $130,100 |
| 2020 | N/A | N/A | N/A |

#### 5. Defendant Hambro

29.     Defendant George A. Hambro ("Hambro") has been a First Solar director since 2012.  He is the Chair of the Technology Committee. Hambro is an operating partner at True North Venture.

30.     As of March 31, 2022, Hambro held 22,988 shares of common stock. Defendant Hambro is a citizen of California, Colorado, or Ohio.

31.     Over the last two fiscal years, First Solar paid Hambro the following compensation:

---

[1]     George was appointed to the board of directors in July 2021 and received prorated compensation based on her partial year of service.

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $115,000[2] | $160,176 | $275,176 |
| 2020 | $115,000 | $160,186 | $275,186 |

### 6.   Defendant Joseph

32.    Defendant Molly E. Joseph ("Joseph") has been a First Solar director since 2017. She is a member of the Audit Committee and the Nominating and Governance Committee.  As of March 31, 2022, Joseph owns 12,519 shares of common stock. Joseph is a citizen of Minnesota or Texas.   Joseph is Chief Executive Officer of UnitedHealthcare Global ("UnitedHealthcare")[3] and Executive Vice President, Global, UnitedHealth Group Incorporated ("UnitedHealth Group").   She also serves on UnitedHealthcare's Executive Council and UnitedHealth Group's Executive Leadership Team.

33.    Over the last two years, First Solar paid Joseph the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $165,000[4] | $160,176 | $325,176 |
| 2020 | $100,000 | $160,186 | $260,186 |

---

[2]    The Chairs of the Nominating and Governance Committee and the Technology committees receive an additional annual cash retainer of $15,000. The Chair of the Compensation Committee receives an additional annual cash retainer of $25,000. The Chair of the Audit Committee receives an annual cash retainer of $35,000.

[3]    United HealthCare Global is a division of UnitedHealth Group Incorporated.

[4]    Allen and Joseph each received an additional $50,000 in recognition of their prior three-year service on the legacy Special Litigation Committee. Joseph was appointed as Lead Independent Director in July 2021 and received prorated compensation for this position based on her partial year of service.

### 7.  Defendant Kennedy

34.     Defendant Craig Kennedy ("Kennedy") is a First Solar director since 2007.  He is a member of the Audit Committee.  Kennedy serves on the advisory board of True North Venture.

35.     As of March 31, 2022, Kennedy beneficially owned 22,197 shares of common stock. Defendant Kennedy is a citizen of Florida or Washington D.C.

36.     Over the last two years, First Solar paid Kennedy the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $100,000 | $160,176 | $260,176 |
| 2020 | $100,000 | $160,186 | $260,186 |

### 8.  Defendant Kro

37.     Defendant Lisa A. Kro ("Kro") has been a First Solar director since 2022. Kro is a member of the Audit Committee. Defendant Kro is a citizen of Minnesota.

38.     As of March 31, 2022, Kro held 2,258 shares of First Solar common stock.

### 9.  Defendant Post

39.     Defendant William J. Post ("Post") has been a First Solar director since 2010.  He is a member of the Compensation Committee, Nominating and Governance Committee, and Technology Committee.  As of March 31, 2022, Post beneficially owned 32,841 shares of common stock. Defendant Post is a citizen of Arizona.  Post served in various leadership positions at Pinnacle West Capital Corporation ("Pinnacle West") and Arizona Public Service (the largest subsidiary of Pinnacle West and the largest electric utility in Arizona) since 1973, retiring from his position as Chairman and CEO of Pinnacle West in 2010.

40.     Over the last two years, First Solar paid Kennedy the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $100,000 | $160,176 | $260,176 |
| 2020 | $100,000 | $160,186 | $260,186 |

**10.     Defendant Stebbins**

41.     Defendant Paul H. Stebbins ("Stebbins") has been a First Solar director since 2006. He is the Chair of the Nominating and Governance Committee, member of the Audit Committee, and member of the Compensation Committee.

42.     As of March 31, 2022, he beneficially owned 34,906 shares of common stock. Defendant Stebbins is a citizen of Colorado or Florida.

43.     Over the last two fiscal years, First Solar paid Stebbins the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $115,000 | $160,176 | $275,176 |
| 2020 | $115,000 | $160,186 | $275,186 |

**11.     Defendant Sweeney**

44.     Defendant Michael Sweeney ("Sweeney") has been a First Solar director since 2003.  He is the Chair of the Compensation Committee and member of the Nominating and Governance Committee.

45.     As of March 31, 2022, Sweeney held 31,781 shares of common stock. Defendant Sweeney is a citizen of Minnesota.

46.     Over the last two fiscal years, First Solar paid Sweeney the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $125,000 | $160,176 | $285,176 |
| 2020 | $125,000 | $160,186 | $285,186 |

**12.   Defendant Wright**

47.   Defendant Norman L. Wright ("Wright") has been a First Solar director since May 2022. He is a member of the Audit Committee and Compensation Committee. Wright is the Executive Vice President and the Chief Customer Experience Officer of UnitedHealth Group. Wright is also a director of UnitedHealth Foundation, the philanthropic arm of UnitedHealth Group.

48.   Defendant Wright is a citizen of Ohio.

**IV.   THE INDIVIDUAL DEFENDANTS' DUTIES**

49.   By reason of their positions as officers or directors of First Solar and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe First Solar and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee First Solar in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of First Solar and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

50.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of First Solar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.   As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on NASDAQ, the Individual Defendants also owed a duty to ensure the dissemination of accurate,

complete, and truthful information concerning First Solar's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over First Solar's management, policies, and internal controls.

52.     At all times relevant hereto, the Individual Defendants were the agents of each other and First Solar and were always acting within the course and scope of such agency.

53.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at First Solar.

### A.     Additional Duties Under The Code Of Conduct

54.     In his introductory remarks to the Company's Code of Conduct, Defendant Widmar states: "Relentless integrity is expected from everyone, and our Code applies to everyone, from members of the Board…to our Officer, Associates and our valued partners."

55.     The Code of Conduct states that "[w]e are all responsible for acting ethically and in compliance with all laws."

56.      By virtue of such duties, the officers and directors of First Solar were required to:

> a)      Model the highest standards of integrity;
>
> b)      Keep accurate records…records can include but are not limited to financial reports, accounting records, timecards, business plans, environmental reports, accident reports, and expense reports…records must accurately and completely reflect our business transactions, and we must enter them in a timely fashion; and
>
> c)      Bring up issues that need to be reported…to…Your Manager, Human Resources, Compliance Department, Our Ethics Hotline Website,

or Policy Hub.

57.     The Code of Conduct obligates the Board to compete fairly:

We believe in a fair marketplace and know that the quality of our products and services, coupled with our strong focus on our customers, determines our success. We follow all applicable antitrust and competition laws worldwide, and we deal fairly with our customers, suppliers, competitors and other third parties. When we speak about our products and services, we do so proudly but accurately.

58.     The Code of Conduct states: "In every communication on behalf of First Solar – spoken and written – we must always be **accurate**, clear, respectful and professional regardless of the format or platform of the communication."

59.     The Individual Defendants are held accountable for adherence to the Code of Conduct and could face disciplinary action, up to and including termination from the Company if they violate the Code of Conduct.

### B.     Additional Duties of the Members Of The Audit Committee

60.     The members of the Company's Audit Committee have additional duties outlined in the Audit Committee Charter, including requirements that its members:

- assist the Board in monitoring (i) the integrity of the financial statements, (ii) the effectiveness of the system of internal controls of the Company . . .(v) the processes and procedures relating to risk assessment and risk management of financial and disclosure control-related, as well as reporting-related, matters and (vi) the Company's compliance with regulatory and legal requirements (including U.S. federal securities laws) regarding the preceding matters;

- prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement; and

- provide the Board with such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

**C.      Additional Duties Of The Members Of The Nominating And Governance Committee**

61.      The members of the Company's Nominating and Governance Committee have additional duties outlined in the Nominating and Governance Committee Charter, including requirements that its members:

- Review the Company's Corporate Governance Guidelines at least annually and recommend any proposed changes to the Board for approval.

- Conduct reviews of the Board and its committees and "[d]evelop and recommend to the Board for its approval an annual self-assessment process of the Board and…make an assessment reviewing areas in which the Board and/or the Company's management believe improvements could be made to increase the effectiveness of the Board."

## V.      SUBSTANTIVE ALLEGATIONS

### A.      Background

62.      First Solar is a manufacturer of solar panels and a provider of utility-scale photovoltaic ("PV")[5] power plants and supporting services that include finance, construction, maintenance, and end-of-life panel recycling.

63.      First Solar's business is comprised of two main segments. The Modules segment manufactures PV solar panel units, which are then installed at project development sites or sold to third parties. The Company's second segment–the Systems segment– sells sites preinstalled with solar panel units to buyers, such as utility providers and large tech companies.

64.      Within the Systems segment, there are several divisions. First Solar's Project Development division selects a site, secures the rights to acquire and use the site, obtains the requisite studies in connection to developing the site, executes an interconnection agreement, obtains the various permits, and enters into a power purchase agreement ("PPA"),[6] with a third party or "off-taker," concerning the solar power to be

---

[5]      Photovoltaic (PV) panels conduct electricity from the energy of the sun.

[6]      A PPA is a contract used in the solar industry where a developer, such as First Solar, develops a site, including all of the permits and installation of a solar system, with the third

generated by the project. The Project Development division's efforts result in the right to construct and operate a solar power system on a site and the sale of the power generated by the system to a third party.

65.    During construction and after a site has been sold, the Company's engineering, procurement, and construction ("EPC") division provides engineering design and related services, such as construction contracting, while the Company's operating and maintenance ("O&M") division provides support to solar panel sites, including activities associated with operating and maintaining a solar power system. First Solar differentiates itself from its competitors by its unique "vertical integration" model which provides value to customers from manufacturing through site support. Many competitors engage in either the Project Development division or offer EPC and O&M support, but few offer both.

66.    First Solar's Project Development division was extremely lucrative in 2018 and 2017. In 2018, the Company earned $1.15 billion in revenue from PPAs out of a total of $3.06 billion in revenue for the year. In 2017, the Company earned even a greater percentage from its Project Development business, banking $1.2 billion from the division out of total revenue of $2.2 billion.

**B.    First Solar Touts The Cost Benefits Of The New Series 6 Module And Sets Ambitious Goals**

67.    On November 16, 2016, First Solar filed with the SEC, a Current Report on Form 8-K attaching a press release issued by First Solar on that date, announcing the acceleration of a plan to phase out the Series 4 solar module[7] and transition to a new module, the Series 6. In the press release, Defendant Widmar represented that in order

---

party ultimately purchasing the power from the system at a quantity, rate, and for a period specified in the contract.

[7]    Before 2019, First Solar primarily manufactured and sold its Series 4 solar module. The Series 4 module measured approximately two feet by four feet, with a peak electrical power output rating of 125 watts.

to accelerate the Series 6 production, the Company would need to restructure its operations:

> Following the completion of an internal review process to evaluate the best competitive response to address the current challenging market conditions, we have developed plans…to more quickly begin production of our Series 6 module. ***Although the decision to accelerate our Series 6 roadmap requires a restructuring of our current operations, we expect the transition to Series 6 will enable us to maximize the intrinsic cost advantage of CdTe thin-film technology versus crystalline silicon.*** Recent steep module pricing declines require us to evaluate all components of our cost structure and streamline our business model to best position the Company for long-term success.

68.   As part of that restructuring, the Company reported that it would reduce the workforce "at its manufacturing facilities both domestically and internationally as a result of the transition from Series 4 to Series 6 production," and that "[a]dditional reductions in administrative and other staff [were] planned."

69.   The Company also disclosed the substantial costs related to the transition, including "restructuring and asset impairment charges of $500 to $700 million, which includes a cash impact of $70 to $100 million." Indeed, retooling just one of the Company's manufacturing facilities, in Perrysburg, Ohio to produce the Series 6 module cost approximately $177 million and took almost one year to complete.

70.   On December 5, 2017, First Solar issued a press release, announcing the commercial launch of its Series 6 module, which was "expected to enter the commercial market with a power rating of 420-445 watts and conversion efficiency of over 17 percent," vastly outperforming the Series 4 module. Widmar represented that the Company was hitting all production targets: "Since our decision at the end of 2016 to rapidly transition to Series 6, we've hit every incremental target with precision. We are absolutely delighted to be on track for delivery of commercial product early next year."

71.   During First Solar's Analyst Day conference call with financial analysts that same day, Widmar represented that the "Series 6 is going to give us a differentiated

product and a position of strength, which we now can evaluate, how we want to engage the market, and how we think about capacity expansion." According to Widmar, the team at First Solar "has done a tremendous job moving us forward as quickly as efficiently as possible as it relates to Series 6."

72.     Widmar highlighted that the transition costs were far outweighed by the long-term benefits of the new module:

> Series 6 technology difference, okay? I already sort of referenced lowest cost, highest energy, lowest CapEx. It's the best ROIC that's in the industry today, right? We're going to continue to leverage that. That's a point of differentiation and point of strength that we need for this company and we'll continue to leverage it from that standpoint.

73.     First Solar discussed on the call an "aggressive" Series 6 cost per watt reduction target. First Solar's then-Chief Operating Officer ("COO") Philip Tymen de Jong ("de Jong") set out a 40% cost reduction target over the next few years:

> On Series 6, we already went from 1.1 gigawatts to 1.2 gigawatts of the factory. That has tremendous impact on costs. So we'll continue that path, if we won't have the magnitude of the Series 4 because we're starting so much higher. But we'll continue that drive. **All of that added together, that's approximately 40% cost reduction from our 2016 number.** And those are pretty solid road maps behind everyone of us.
>
> ***
>
> So all of that is working together to bring down our system cost. **System costs will come down by over 40% here over this next few years.**

74.     Widmar represented that the Series 6 would bring higher margins to the Company and an attractive ROIC[8] profile:

> But more importantly, as we move to Series 6, I've even created a more disruptive position from a cost standpoint. So we're significantly advantaged on the cost.

---

[8]     ROIC is "Return on Invested Capital" and is a performance ratio that measures the percentage return that a company earns on invested capital, showing how efficiently a company is using the investors' funds to generate income.

And we're significantly advantaged on the value side of capturing the energy and capturing the premium of the market from an ASP[9] standpoint.

You couple that, then, with a very competitive CapEx per watt, lowest in the industry. It gives you an attractive ROIC. So you got that competitive differentiated technology that gives you a higher-margin entitlement and a more attractive ROIC profile.

75.     Alexander Bradley ("Bradley"), the Company's Chief Financial Officer ("CFO"), confirmed that First Solar would gain cost efficiency and increase gross margins through the new module:

We also have an additional cost per watt advantage through the Series 6 technology. And that leads us to a Series 6 gross margin entitlement above 20%. And this is for a Series 6 fully ramped, large-scale manufacturing site.

***

The majority of our OpEx is fixed cost, [which] means that we can incrementally improve operating margins as we go forward.

76.     Bradley also laid out an ambitious 1-gigawatt per year target in new development, remarking that "[f]rom a business mix perspective, we look to have about 1 gigawatt a year of development business, some incremental EPC business, O&M business and then a significant expansion of module sales as we grow capacity."

77.     Widmar noted that the Company was building a third-party pipeline to effectively launch Series 6:

We initially thought we would only be able to effectively launch Series 6, which is still the goal, with our own self-developed assets. But we wanted to start building the pipeline of third-party shipments for Series 6. And right now, we have very good visibility for Series 6 into 2019 and 2020. . . . Bottom line, cleared on commitments.

78.     Widmar affirmed the Company's ability to scale appropriately: "**We're going to increase capacity. All right. We're going to continue to scale our fixed costs.** We'll align with the customer demand. Again, the capacity plan will align to…available demand that's in the marketplace."

---

[9]     ASP is an abbreviation for average selling price.

-19-

**C.    The Individual Defendants Knew The Material Risks Regarding First Solar's Core Operations**

79.    On February 23, 2018, the Company filed with the SEC its Annual Report on Form 10-K (the "2017 10-K"). In the 2017 10-K, First Solar disclosed the risks in connection with poor performance and quality of the modules produced by the Company:

> ***Problems with product quality or performance, including our Series 4 modules and Series 6 modules, may cause us to incur significant and/or unexpected warranty and related expenses, damage our market reputation, and prevent us from maintaining or increasing our market share.[10]***
> We perform a variety of module quality and life tests under different conditions upon which we base our assessments and warranty of module performance over the duration of the warranty. However, if our thin film solar modules, including our Series 4 modules and Series 6 modules, perform below expectations, we could experience significant warranty and related expenses, damage to our market reputation, and erosion of our market share.

80.    The 2017 10-K emphasized the importance of the vertical integration throughout First Solar's various divisions, which provided unique value to its customers:

> We are vertically integrated across substantially the entire solar value chain. Many of the efficiencies, cost reductions, and capabilities that we deliver to our customers are not easily replicable for other industry participants that are not vertically integrated in a similar manner. Accordingly, our operational model offers PV solar energy solutions that benefit from our wide range of capabilities, including advanced PV solar module manufacturing; project development; engineering and plant optimization; grid integration and plant control systems; procurement and construction consulting; and O&M services.

81.    The 2017 10-K disclosed risks related to potential securities litigation:

> ***We are subject to litigation risks, including securities class actions and stockholder derivative actions, which may be costly to defend and the outcome of which is uncertain.***
>
> From time to time, we are subject to legal claims . . . that may be costly and which may divert the attention of our management and our resources in general….Certain of these lawsuits assert types of claims that, if resolved against us, could give rise to substantial damages, and an unfavorable outcome or settlement of one or more of these lawsuits, or any future lawsuits, may result in

---

[10]    Emphasis in original. All emphasis herein is added unless otherwise stated.

a significant monetary judgment or award against us or a significant monetary payment by us, and could have a material adverse effect on our business, financial condition, or results of operations. Even if these lawsuits, or any future lawsuits, are not resolved against us, the costs of defending such lawsuits may be significant and may not be covered by our insurance policies (Emphasis in original).

82.     On February 22, 2019, First Solar filed with the SEC its Annual Report on Form 10-K (the "2018 10-K"). In the 2018 10-K, the Company again emphasized the importance of vertical integration throughout its various divisions.

83.     The 2018 10-K, touted the benefits of the new Series 6 module and demonstrated the Company's reliance on the new module:

In addressing the overall global demand for electricity, our high-efficiency CdTe modules, led by our Series 6 module technology, and fully integrated systems provide competitively priced utility-scale PV solar energy solutions, which compete on an economic basis in many climates with traditional forms of energy generation and provide low-cost electricity to end-users. Our vertically integrated capabilities enable us to provide such solutions, accelerate the adoption of our technology, and successfully sell into key markets around the world.

***

Our Series 6 module technology, with its combination of high wattage, low manufacturing costs, a larger form factor, and balance of systems ("BoS") component compatibility, has further enhanced our competitive position since the launch of such technology in 2018. We expect our continued transition to Series 6 module technology to enable us to maximize the intrinsic cost advantage of CdTe thin film technology versus crystalline silicon.

84.     The 2018 10-K disclosed the risks related to the transition to the Series 6: Our future success depends on our ability to effectively balance manufacturing production with market demand, convert existing production facilities to support new product lines, *such as our* transition *to Series 6 module manufacturing, and increase both our manufacturing capacity and production throughput over time in a cost-effective and efficient manner.*

85.     The 2018 10-K disclosed the risks in connection with failure modes in connection with the new modules:

[O]ur solar modules, including our Series 4 modules and Series 6 modules, could

suffer various failure modes, including breakage, delamination, corrosion, or performance degradation in excess of expectations, and our manufacturing operations or supply chain could be subject to materials or process variations that could cause affected modules to fail or underperform compared to our expectations. These risks could be amplified as we implement design and process changes in connection with our efforts to improve our products and accelerate module wattage as part of our long-term strategic plans and as we transition to Series 6 module manufacturing.

86.    The 2018 10-K noted that failure rates could increase based on installation conditions:

[A]s we increase the number of installations in extreme climates, we may experience increased failure rates due to deployment into such field conditions. Any widespread product failures may damage our market reputation, cause our net sales to decline, require us to repair or replace the defective modules or provide financial remuneration, and result in us taking voluntary remedial measures beyond those required by our standard warranty terms to enhance customer satisfaction, which could have a material adverse effect on our operating results.

87.    The transition to Series 6 further carried the risk that the significant investment would not be worth the benefits:

We seek to continuously improve our products and processes, including, for example, our transition to Series 6 module manufacturing, and the resulting changes carry potential risks in the form of delays, performance, additional costs, or other unintended contingencies. In addition, our significant expenditures for R&D may not produce corresponding benefits.

**D.    The Individual Defendants Mislead Investors Regarding The Performance Of The Series 6 Modules And The Success Of Its Project Development Division**

88.    On October 25, 2018, First Solar filed with the SEC a Current Report on Form 8-K attaching a press release disseminated that day in which First Solar reported its third quarter 2018 financial results. In the press release, Widmar claimed a successful rollout of the Series 6 modules:

[W]ith the start of Series 6 production at our Vietnam factory we now have three locations manufacturing our most advanced product. Demand for Series 6 continues to be resilient as demonstrated by bookings of 1.1GW$_{DC}$ since our prior

earnings call. This brings our total contracted volume to 11.3GW$_{DC}$ and provides us with a strong competitive advantage as we move forward."

89.     On an earnings call with investors and securities analysts that same day, Widmar again represented that the transition to the Series 6 was going smoothly:

From an operational standpoint, we have started the first commercial shipments of Series 6 from our factory in Vietnam, and progress to-date on the initial ramp has been good. Commercially, we continue to be very pleased with the strong demand for our technology as demonstrated by our net bookings of 1.1 gigawatts since our prior call.

90.     Widmar also commented that the increased performance of the Series 6 made it attractive to corporate buyers and positioned the Company to take on new opportunities:

The transition is expected to be particularly noticeable among corporate buyers of renewable energy who in recent years have tended to procure more wind than solar. With multiple gigawatts in our development portfolio, we expect to be able to take advantage of the recent IRS commenced instruction guidelines and enhance the value of these development opportunities.

91.     CFO Bradley revised the Company's 2018 outlook, disclosing higher than expected "ramp costs" and lower than expected Series 6 sales, blaming the low sales on "changes in shipment timing as well as a reduction in certain internal shipments." Bradley reaffirmed the Company's goal of building a systems portfolio with an "average of approximately 1 gigawatt per year over the next few years."

92.     Widmar stated that "bookings are starting to go up further" for Series 6 modules because "we're sold out through 2020," and noted the Company's plan to have "as much capacity of Series 6 in 2021" as possible because "[s]cale is important to drive contribution margins."

93.     Widmar reported that the Company was "very happy with how [Series 6 is] positioned in the market and the value it's capturing," with a "10% premium over our Series 4" and "much lower cost profile entitlement."

94.     Widmar also reported favorable market demand for Series 6: "So, what I'm seeing on Series 6 right now has been very much in line, maybe slightly more favorable than what we had anticipated, but the products have been very well received in the marketplace."

95.     During 2019, continuing into 2020, First Solar represented to investors that the Company was meeting its cost per watt reduction targets and touted the success of the Series 6 program and the consistent improvement of the cost per watt of the Series 6.

96.     On February 21, 2019, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing fourth quarter 2018 financial results. In the press release, Widmar touted the progress for the Series 6 module, with "ongoing improvements in throughput and efficiency at our existing facilities." The Company provided guidance for 2019, including net sales within a range of $3.25 to $3.45 billion.

97.     On a conference call with financial analysts and investors held that day, Defendant Widmar claimed First Solar had "seen steady improvement in our Series 6 throughput in wattage across our entire fleet."  When asked by an industry analyst if First Solar was falling short of its contractual requirements when it came to wattage output, Widmar downplayed the issue, blaming it on an issue with anti-reflective coating on some Series 6 units, and stating, as "we go forward . . . some of the early launch issues that we had will be subsided."

98.     Widmar assured that the Company was making a "big investment" in the Project Development division to develop further sites with an investment of around "$300 million to $400 million to secure, [about] 5 gigawatts of opportunities between now and 2023."

99.     Bradley attributed any lower earnings in the first half of 2019 to "the timing of ramp and start-up charges," assuring that "[t]he greatest benefit of our improved ramp and efficiency is anticipated to be in the second half of the year." When

asked by an analyst why the Company was not increasing guidance for 2019 based on the potentially lucrative second half, Bradley answered that "you can see that small changes in timing could have large impacts on the back end of the year," and therefore it was "hard to evaluate."

100.   Widmar touted the Company's opportunities in its Systems segment: "Even with the more than 300 megawatts of recent systems bookings, our potential systems opportunities remain strong at 1.8-gigawatt DC. These potential systems bookings are comprised of projects in the U.S. and over 300 megawatts in Japan."

101.   Widmar represented that the Company was poised to meet its goals of 1 gigawatt per year: "In addition, we added EPC scope to 500 megawatts of previously booked module sales, which, combined with our development bookings, **positions us to meet or exceed our targeted 1 gigawatt per year of systems business."**

102.   On May 2, 2019, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing financial results for the first quarter of 2019. In the press release, the Company reported a first quarter loss of $0.64 per share, compared to earnings per share of $0.49 in the fourth quarter of 2018, and a decrease of $159 million in net sales from the previous quarter.

103.   That day, during First Solar's earnings call with securities analysts and investors for the first quarter of 2019, Widmar blamed the weak earnings on "some unanticipated non-Series 6 related costs," including, a "higher-than-expected construction labor market and certain equipment supply issues," weather delays, and project cost management. Bradley also represented that the disappointing financial results were due to non-Series 6 related costs including "tight construction schedules, labor shortages, non-force majeure weather-related work stoppages, failure by high-voltage transformer factory acceptance tests, the financial distress of a major subcontractor and certain rework."

104.   Widmar stated that "since the February earnings call, we have seen significant operational improvements across our Series 6 factory" and pointed to "the progress we have made ramping our factories" which has been "a key contributor in enabling us to achieve our first quarter Series 6 cost per watt objective."  Widmar put the "average watt per module" increase at "slightly more than 1 bin or 6 watts."

105.   Widmar again touted the strength of the Systems segment with the Company's "mid-to late-stage pipeline" including "approximately 900 megawatts of systems opportunities across the U.S. and Japan."

106.   The Company increased its 2019 guidance, with a net sales forecast of $3.5 billion to $3.75 billion, a $250 million increase.

107.   On August 1, 2019, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing First Solar's second quarter financial results. In the press release, the Company reported an $0.18 per share loss compared to the previous quarter's $0.64 per share loss. Widmar was quoted in the press release as stating that Series 6 production and bookings with "record module production and shipments during the second quarter," and stated that with "our recent bookings success we are now essentially sold out through 2020, with significant bookings visibility into 2021."

108.   In the conference call with securities analysts and investors held that day, Widmar focused on the record production and bookings: "From a bookings perspective, we recorded our largest ever individual order for Series 6 modules and from a shipment perspective we recorded record quarterly shipments. These highlights are a reflection of the team's continued excellence in a very dynamic and changing business environment."

109.   Widmar highlighted First Solar's increased systems opportunities, remarking that "[w]e continue to believe in the strength of our portfolio of systems opportunities in Japan and we could double our existing systems bookings there by the

-26-

1    end of 2023," and provided a "1.9 gigawatts" figure for "systems opportunities across

2    the U.S. and Japan" for the "mid to late-stage pipeline."

3         110.    First Solar executives also confirmed that the Company had achieved the

4    Series 6 cost per watt objective it had set for the first half of 2019. Widmar stated: "The

5    progress we have made ramping our factories has been a key contributor, enabling the

6    achievement of our Series 6 cost per watt objectives for the first half of 2019." Widmar

7    further praised the Series 6 progress "in terms of schedule performance and cost," setting

8    the increase of the average watt per module at three watts.

9         111.    Bradley explained that the Company would achieve significant cost

10   reductions in the rest of the year and meet 2019 guidance: "Our guidance continues to

11   assume both a back-ended Series 6 module sale profile, as well as a significant Series 6

12   cost reduction profile over the next two quarters. As Mark [Widmar] noted earlier, our

13   Series 6 cost per watt is expected to drop approximately 30% from Q1 to Q4." In

14   response to analyst questioning the Company's ability to meet guidance on costs per

15   watt, Bradley assured investors  "that we are happy with where we are right now. We

16   met our first half commitment on the reduction…."

17        112.    In a September 19, 2019 press release, the Company announced it was

18   transitioning to a third-party execution model for its engineering, procurement, and

19   construction ("EPC") division:

20       The transition to leveraging third-party EPC services will occur through the rest
         of 2019 and will not impact any projects under construction and slated for
21       delivery this year. This evolution will allow the Company to solidify its
22       competitiveness and position as America's leading solar module manufacturer.

23        113.    Widmar remarking about the decision to outsource the EPC division stated

24   that "[w]e expect that this shift will allow us to concentrate on our core business of

25   scaling, developing, and selling our world-class module technology while executing on

26   our project development pipeline with the same level of service that our customers have

27   come to expect."

-27-

114.   In the press release, the Company announced it was investing in expanding its manufacturing capacity for the Series 6 modules:

> First Solar is expanding its manufacturing capacity to meet the demand for Series 6 modules, with its second facility in the United States - representing nearly $1 billion in cumulative investment - expected to start production in early-2020. Once operational, the new facility in Perrysburg, Ohio, will take the Company's aggregate Series 6 manufacturing capacity to 5.4GW per year, making First Solar America's largest solar manufacturer.

115.   In an October 23, 2019 press release, the Company announced that D.E. Shaw Renewables had acquired several projects from First Solar. In the press release, Georges Antoun, First Solar's Chief Commercial Officer, stated: "DESRI's decisions to invest in assets are always backed by rigorous research and analysis, and their acquisition of our projects *validates the robustness of First Solar's approach to project development*."

116.   On October 24, 2019, First Solar filed with the SEC a Current Report on Form 8-K attaching a press release from the Company announcing the third quarter 2019 financial results. In the press release, the Company reported that net sales for the third quarter were $547 million, a decrease of $38 million from the previous quarter.

117.   Later that same day, First Solar held its third quarter 2019 conference call with securities analysts and investors. During the call, Defendant Widmar stated: "At the beginning of the year, we laid out an aggressive Series 6 cost per watt reduction target for 2019 . . . we are pleased with the progress made and are slightly ahead of the roadmap." Widmar noted "significant operational improvements" including that for Series 6, "[t]he average watt per module has increased 4 watts."

118.   Widmar touted the Company's competitive advantage and expressed confidence First Solar's business plan:

> Through our recent R&D efforts, we have successfully replaced copper with an alternative material, which dramatically improves device performance…. While yet to transition this advancement to our commercial products, we expect the combination of improved efficiency and long-term degradation *will further*

-28-

*enhance the competitive advantage of our technology and gives us confidence in our long-term road map.*

119.    Bradley blamed the failure to meet previously provided guidance on several external factors, including project sales structuring.

120.    When questioned by an analyst about cost reductions, Widmar admitted to "a couple of headwinds that I mentioned in the call, mainly impacting our Ohio factories," but assured that, "as I look across the long-term horizon and ultimate destination where it will end up, we're very confident that we'll meet the target that we set out for with Series 6."

121.    Widmar continued to tout the Systems segment's performance including "2 gigawatts of systems opportunities across the United States and Japan." Widmar also noted: "Our energy systems business continues to perform strongly with an additional 1 gigawatt contracted since our previous earnings call. This brings new bookings in 2019 to 2.6 gigawatts and our total energy services portfolio under – of assets under contract to nearly 14 gigawatt [] levels."

122.    Widmar discussed the Company's recent decision to outsource the EPC division:

> [O]ur competitive financial position enable First Solar to continuously evaluate the cross structure, competitiveness and risk-adjusted returns of each of our product offerings, including the module, development and O&M businesses. [W]e have evaluated our EPC capability and are transitioning to a third-party execution model. As a result of this transition, approximately 100 associates directly associated with our EPC capabilities will leave the company.
>
> Widmar stated that the shift was needed to best position the Company for success:
>
> Since announcing the launch of Series 6, we have contracted over 15 gigawatts and have created a position of strength with a multiyear pipeline. However, we cannot be complacent; rather, now is the time to challenge oursel[ves] to secure the right long-term sustainable cost structure for our module manufacturing, development and O&M businesses in order to best position each for success over the next decade.

123.    Bradley also painted the shift as a tactical move "to make sure we're cost competitive across every business unit."

124.    In a Company press release on December 17, 2019 announcing the acquisition of three projects powered by First Solar's latest thin-film module technology, Chief Commercial Officer Georges Antoun stated that the sales prove "that investors are focused on the winning formula: responsible development, attractive project economics, and long- term Power Purchase Agreements, ***underpinned by high-performance PV modules and a partner that stands behind its commitments***." Antoun thanked the buyers for "their trust and recognizing ***the robustness of First Solar's approach to project development*** in the United States."

### E.    The Company Admits The Failures Of The Series 6 Modules And Its Project Development Business

125.    In a January 15, 2020 analyst report, Barclays, a corporate and investment bank, cut the price target for First Solar common stock from $66 to $49 per share, downgrading its rating from Overweight to Underweight. In the report, Barclays noted that "It looks to us like FSLR's systems business is in trouble."

126.    According to the report, since *January 2019*, First Solar was dependent on its vertical-integration model to be successful, relying on "trough cycle support" from its project development sector: "**As we've stressed since our initiation (1/7/19)**, FSLR's value proposition is premised on a robust balance sheet ($1.5+ bn net cash), and through-cycle support from project development. this is where most of the multi-year gross profit emanates, irrespective of manufacturing's booms and (and mostly) busts."

127.    Barclays' downgrade of the Company's stock was based on First Solar's declining market share and the report revealed that the Systems segment had lost ***more than 80%*** of its domestic market share:

First   Solar captured 20% of the market—defined as a fully integrated development and project sale role or sometimes just as EPC provider (we est. ~1/4th  of the time)—and now they reflect just 4% of the development pipeline.

128.     Barclays also pointed out that the decline in market share was concealed in First Solar's quarterly and annual filings because the filings only show contracted assets:

> FSLR was the #1 ranked runaway player, part of 1 in 5 MWs of utility scale solar to date, through full development and/or EPC. ***They're now 4% of the pipeline, most of which are dated announcement from 2016 or earlier.*** It's unobservable in 10Q/Ks, as those updates only show contracted assets.

129.     According to the report, most analysts were fooled into thinking that First Solar's Systems segment was performing better than it was because of the long development timeline:

> FSLR's announced closing of its in-house EPC business was an ominous hint, but explainable. And given long development timelines, FSLR still has a leading share of project CODs in 2019. This is primarily why we and the Street have missed the rapid decline in share.

130.     The report forecasted that First Solar would miss analyst guidance based on its current market share:

> We and many others have been forecasting 1.1-1.5 GWac by 2021+, assuming as much as 8-10% capture of a rapidly expanding U.S. market**. Now it seems 1 GWac/year may be unreachable by 2021 (and may miss widely).** Sourcing-out EPC will help, but it's an unknown – all while PPA prices keep falling.

131.     Barclays reported that it only discovered the truth behind First Solar's smoke screen by performing an in-depth analysis of a Bloomberg database, correcting the database to account for company purchases, and confirming data points from the Company's public filings:

> Data is based on the Bloomberg New Energy Finance (BNEF) database. We combed through and corrected the database to account for company acquisitions, multiple company names, etc., as well as specifically corroborated FSLR's data points on commissioned/operational assets with FSLR's own 10Q/K updates. . .

132.     Barclays concluded that "***the core takeaway is that FSLR is struggling to compete with both old and new market participants***, and gave a grim outlook for First Solar: "Going through the current pipeline of assets,  the age of the pipeline  (when new development projects were announced), and the stages of development, we see it as

1   unlikely that  FSLR will be able to maintain a position among the leading U.S.

2   downstream players."

3       133.   The report compared First Solar's projects to that of a competitor, noting

4   that in 2018 First Solar's pipeline projects represented just .6 GW of the 32.0 GW in

5   total domestic projects. Barclays reported that "new project developments that started

6   in 2019 look especially low for First Solar," and that it "could only find two projects,

7   one in Texas (an already highly-competitive market) and the other in Ohio."

8       134.   Barclays found that First Solar was relying on its old project development

9   pipeline, fooling investors and analysts for years: "[Some new developments] may be

10  missing, but directionally, the data would tell the same story: First Solar is coasting on

11  its old pipeline (which includes many old development assets)." The Company's

12  pipeline was filled with projects from 2016. First Solar's market share decline began in

13  2017, dropping from 14% in 2016 to approximately 4% in 2017, 2% in 2018, and 1% in

14  2019.

15      135.   Based on the data, Barclays warned that "[t]he systems business could be

16  in for a significant drop in deployments in the early 2020s, especially relative to the 1

17  GW p.a. guidance and investor expectations."

18      136.   Following the release of the investigative report, the Company's stock

19  dropped nearly seven percent in one day, declining from a close of $58.78 per share on

20  January 14, 2020, to close at $54.75 per share on January 15, 2020.

21      137.   On February 20, 2020, First Solar filed with the SEC a Current Report on

22  Form 8-K attaching two press releases announcing the financial results for the fourth

23  quarter of 2019, the full-year 2019 results, and financial guidance for 2020.  The

24  Company reported a fourth quarter GAAP loss per share of $0.56, compared to GAAP

25  earnings per share ("EPS") of $0.29 in the prior quarter, and full-year GAAP loss per

26  share of $1.09.

27

138.   The Company reported that with the assistance of advisors, First Solar "is reviewing options for its U.S. project development business."  Widmar stated: "Given the significant evolution of developing utility-scale PV projects in the United States, we believe now is an appropriate time to evaluate our options with respect to our U.S. project development business line."

139.   In a conference call that day with securities analysts and investors, Bradley reported that the Company would miss its sales guidance for 2019: "Relative to our guidance expectations, net sales were lower, primarily due to the aforementioned delay in the sales of our Japan and India assets as well as lower than forecast percentage of completion from our U.S. asset sales and timing of revenue recognition on certain module sales." Bradley went on to disclose that the Company missed guidance on nearly all financial benchmarks, resulting in a loss for the year.

140.   Widmar continued to claim that the Company held a competitive advantage based on the Series 6 module: "Series 6 technology, product road map and market-leading research and development are all key differentiators, which we believe will enable us to meaningfully participate in this wave of demand for clean and affordable energy."  However, Widmar disclosed that First Solar had failed to achieve its efficiency goals in relation to Series 6:

> On our 2017 guidance call in November of '16 and updated at Analyst Day in December of '17, we provided an expectation of near and mid-term efficiency goals. As shown by the purple dot and the yellow line on the graph, we expected to launch in 2018, a 420 to 430 watts per module. And we set out a mid-term target of 460 watts per module.
>
> At the end of 2018, despite a high band of 425 watts, our average watts per module was only 411, as we faced challenges in the initial ramp of our Series 6 product…. By year-end 2019, our average watts per module has increased to 430 watts on a fleetwide basis, with a high den of 435 Watts.

141.   Widmar disclosed that the Company failed to achieve its touted 40% reduction in cost per watt due to "challenges with regard to certain aspects of the overall

cost per watt and particularly related to glass and frame cost compounded by tariff gyrations and uncertainty." Widmar pushed off the original cost per watt target till the end of 2020: "[W]e are expecting to exit 2020 at our low cost, high volume manufacturing sites, having achieved the original cost per watt target that we set out in November of 2016."

142.   Widmar admitted that to remain competitive the Company would need to improve its internal capabilities dramatically and therefore decided to outsource its EPC division: "[F]or us to remain competitive in the long term, we would need to invest in enhancing our capabilities and offerings to the market to reflect this new development paradigm, while maintaining a competitive cost structure…. Accordingly, our focus is not to create internal capabilities that already exist externally."

143.   Bradley stated that the Company would not be providing cost per watt guidance for 2020: "While we're not providing specific guidance around the Series 6 module cost per watt for 2020, we do anticipate continuous improvement over the course of the year." Widmar, in response to analyst questioning, explained why the Company would not provide a figure for cost per watt:

> Customer[s] start[ed] to hold [the Company] accountable to a cost-plus model. [T]hat's not what we want to do, we want to be out there selling the full entitlement of the value that we create and not get stuck on a cost plus. [S]o we have purposely moved away from giving discrete cost per watt.

144.   Widmar confirmed the representation in the press release that the Company was considering a sale of the Project Development division:

> [W]e are working with an advisor to evaluate strategic options to best position our U.S. development business with the mandate -- to position the business to succeed in a continuing evolving market for solar generation assets, while maximizing value for First Solar shareholders.
>
> While we're open to partnering with a third-party who possesses complementary competencies and capital to further scale the business, the pursuit of a partnership could potentially result in a complete sale of the U.S. development business.

145.     The dismal financial news caused First Solar's stock to fall nearly 15% in one day, dropping from a close of $59.32 per share on February 20, 2020 to close at $50.50 per share on February 21, 2020.

146.     On January 25, 2021, First Solar filed with the SEC a Current Report on Form 8-K reporting a definitive agreement with Leeward Renewable Energy Development, LLC to sell the Company's Project Development business for $261 million. In a press release attached to the 8-K, Defendant Widmar stated that the sale is "[e]nabled by our Series 6 module's seamless compatibility with industry systems and processes," and "part of a transition that allows us to focus on doing what we do best, which is scaling, developing, and selling our world-class module technology."

**F.      First Solar Is Sued In A Securities Class Action**

147.     On January 7, 2022, a securities class action lawsuit was filed in the United States District Court for the District of Arizona against the Company, Defendant Widmar, Bradley, and Antoun, alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

148.     An amended complaint was filed on June 23, 2022 captioned *Palm Harbor Special Fire Control and Rescue Dist. Firefighters' Pension Plan, et al., v. First Solar, Inc., et al.,* No. 2:22-cv-00036-MTL (D. Ariz.).  The complaint seeks damages on behalf of a class who purchased First Solar shares between February 22, 2019, and February 20, 2020, inclusive. The plaintiff asserts the defendants made false and misleading statements and omissions regarding the performance of its Series 6 module and the Company's ability to consistently meet benchmarks to reduce costs and increase wattage per module.

**G.    Confidential Witnesses In The Securities Class Action[11] Disclose That The New Modules Suffered From Substantial Undisclosed Manufacturing Defects And Operating Malfunctions**

149.    The fact that First Solar was unable to capture a significant market share and meet its targets for the Series 6 modules were telltale signs of the Company's recurring problems with the new modules.    Several former First Solar employees confirmed that despite the Individual Defendants' ongoing representations that the Series 6 modules were performing per Company expectations and that the Company was on track to meet the cost per watt and performance targets, in reality, the Series 6 transition was marred by manufacturing, operational, and transportation issues. The Company was having difficulty packing the large and fragile modules properly to avoid damage. Even after installation at the various sites, the new modules suffered from electrical fires and failed to meet their expected output. The ongoing issues raised the cost per watt production and affected the watts per module as well.

**1.    The Series 6 modules suffered from electrical defects**

150.    CW1[12] reported that the California Flats project was First Solar's first commercial project using the Series 6 modules.

151.    CW2,[13] a member of the Company's Quality group, regularly received reports from the manufacturing team located in Perrysburg, Ohio, describing electrical problems and asking the Quality team to inspect the modules to identify the source of the electrical shorts. Specifically, according to CW2, in late 2018 and early 2019, the

---

[11]    While Plaintiff and its undersigned attorneys have conducted their own independent investigation of the wrongdoings alleged herein, the Confidential Witness ("CW") allegations herein are based upon allegations contained in the Securities Class Action Complaint. Regardless of gender, all CWs will be described in the masculine as in the Securities Class Action Complaint.

[12]    CW1 was a First Solar engineer at the Company's headquarters from at least 2016 through February 20, 2020.

[13]    CW2 was a regional manager from at least 2016 through 2020, overseeing EPC construction quality in many countries.

Series 6 electrical issues stemmed from problems with the cord plate and the "potting"[14] applied to the plate to protect it from the elements. Defects in the potting process caused some of the cord plates to come loose and, in some cases, catch fire. CW2's Quality team was tasked with finding the defective modules and replacing them. CW2 emphasized that the electrical problems were exclusive to the Series 6 modules and did not occur in the Series 4 modules.

152.    CW3, a First Solar quality assurance specialist and electrical lead,[15] reported "a major problem" with several fires in the Series 6 junction boxes at Willow Springs, causing blowouts and the subsequent failure of the entire electrical circuitry at the project.   The junction box issues began in 2018 and continued throughout 2019. CW4[16] reported that fires in junction boxes led to disabled modules at the Mount Signal II, Cove Mountain, and Sun Streams projects.

153.    CW1 confirmed reports of electrical fires in the California Flats project in early 2019.

154.    CW5, a lead in the Quality Assurance group,[17] stated that there were wiring issues in the Series 6 modules that caused the fires in the junction boxes when he worked at the Mesa, Arizona facility where the Company had a test site. According to CW5, the lab at the test site was working on a fix for the defective junction boxes. Based on his conversations with his colleagues at the lab, CW5 understood that the wiring connection in the junction boxes was incomplete, causing overheating that melted the box and resulted in fires. CW5 reported that the employees at the test site worked for more than a year on a solution. One solution proposed was the installation of a metal

[14]    Potting is a process of filling a complete electronic assembly with a compound for resistance to shock and vibration, and for exclusion of moisture and corrosive.
[15]    CW3 worked in this position from 2016 until 2020, inspecting Series 6 modules at the Willow Springs project.
[16]    CW4 was a power plant manager in First Solar's O&M division at ten sites in multiple states in 2019-2020. Several of these sites used Series 6 modules.
[17]    He worked in this position from at least 2016 through 2020 at various Series 6 sites.

-37-

box over the junction box, but the metal box also overheated and caused fires. CW5 reported that he saw melted junction boxes on the Series 6 modules.

155.    CW5 reported that the issues with the faulty wiring impacted at least the first **200,000 Series 6 modules** produced as a result of the Company's rush to produce the Series 6 modules and overlooking the quality control issues. First Solar decided not to hire an inspector to check these first modules.  CW5 reported that instead of recalling the damaged units, thereby revealing the underlying issues, the Company sent several engineers to attempt to address the electrical fires. CW3 confirmed that the Company was only concerned about replacing the modules after the junction fires, failing to address the underlying issues. CW5 stated that these defective modules were sent to the California Flats and Willow Springs projects, and one more project in the area. These three projects suffered from the same melting junction boxes and electrical fires.

**2.     The Series 6 modules failed to reach target outputs**

156.    According to confidential witnesses, the Series 6 modules could not perform at the Company's 460 watts per module midterm target. The weak output forced the Company to either pay liquidated damages to customers, cancel scheduled deliveries and installations, or install additional panels to meet the wattage contractually required.

157.    CW1, an engineer, stated that the Series 6 ramp suffered from "challenges," with the Company failing to realize its intended "panel capacity" for the module. CW1 reported that the new modules were providing between 420 and 440 watts in late 2018 when they were first released. The Company had a benchmark of 440 watts for 2019, but still had not reached that output in 2021.

158.    CW1 was tasked with mapping the placement of the modules based on output at the California Flats projects.  When the project went online, a portion was short on "DC Capacity." Consequently, First Solar had to install additional modules and panels.

159.   Likewise, CW2 reported that the Company had to add additional modules to several sites in 2019 because Series 6 was not producing the requisite output necessary to meet the requirements outlined in the PPAs.  CW2 stated that First Solar could not rely on consistent wattage output at the Willow Springs and California Flats projects.

160.   CW4 reported that different areas of sites had different wattage outputs because the modules were produced at different times. CW4 further reported contract issues, including with D.E. Shaw, from the underperformance of Series 6 modules. CW4 recalled that the Company was required to pay liquidated damages to customers based on the contract breaches.

161.   CW6[18] confirmed that the Series 6 modules failed to produce wattage as expected and certain modules could not be delivered to customers because of their low wattage outputs.

**3.     Series 6 modules broke in transit**

162.   According to CW7, a site logistics coordinator,[19] the Company had logistical problems with the packing and shipping of the Series 6 modules. CW7 reported that the modules were large and fragile, weighing approximately 1,6000 to `1,700 pounds each. The heavy modules could only be lifted by an extendable boom. Many of the sites did not have a suitable area for unloading the large pieces, leading to a large number of modules breaking during the unloading process. CW7 stated that about half of the modules broke during the second phase of one of the projects, that he was constantly sending back modules to Ohio for repair, and that the cost of replacing broken and defective modules increased the costs per watt for the Series 6 modules.

---

[18]   CW6 was a project manager in the O&M division from 2019 to 2020 and worked on several Series 6 sites.
[19]   CW7 worked in this position from at least 2016 through late 2019. CW7 worked on numerous development projects involving Series 6 installations.

163.   CW8, a supply chain manager in First Solar's EPC division,[20] corroborated the reports of modules breaking before installation and in transit and the increase in cost per watt due to the broken and defective modules.

**H.   The Individual Defendants Ignored Red Flags**

**1.   The Series 6 issues were well known in the C-Suite from town hall meetings and reports**

164.   CW4 stated that in almost every quarter from 2018 until 2020, Defendant Widmar held "all hands town hall" meetings at the Company's Tempe, Arizona office shortly before or after the Company's quarterly conference calls with financial analysts and investors. Widmar usually led the meetings, where the problems with the Series 6 modules were discussed, including the failure to reach the "baseline" output of 440 watts. CW1 confirmed that he regularly attended these meetings.

165.   CW2 reported that after the manufacturing team would notify the C-Suite of problems with the new modules found after inspection, and trainings or meetings to address the problems. CW2 stated that documents detailing the problems with the modules were reviewed by the C-Suite before being sent to him.

166.   CW6 reported that certain Series 6 modules so underperformed in terms of wattage that they could not be shipped to customers and the Company was forced to withhold shipments. CW6 reported that there was no way that First Solar's upper management could not have known about withholding such crucial shipments on large multi-million-dollar PPAs.

167.   CW7 reported that from about July through September 2019, there were major problems at the Seabrook project, including Series 6 issues. CW7 stated that First Solar's Vice President of Construction **and two members of the Board** visited the site to address the problems.

---

[20]   He worked in this position from at least 2016 until late 2019, including on many Series 6 projects.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## 2. The fact that the Project Development division was declining was well known in the Company

168.   CW4 recalled that First Solar's Project Development team stopped responding to requests for proposals for new projects and stopped bidding on new projects sometime in 2019. A Company portal, "PINS," contained all of the documentation for the Project Development, EPC, and O&M divisions. CW4 had access to PINS and observed the lack of activity in the Project Development division in 2019 in comparison to previous years.

169.   CW4 reported on a shift in the discussions at the quarterly Town Hall meetings. Before 2019, Widmar and his team talked about Project Development deals and the financials connected with those deals. However, beginning in 2019, there were no updates given for the division. Numerous conversations with colleagues in the other divisions confirmed that the Company was not actively looking to book new projects.

170.   CW2 reported Town Hall discussions with Defendant Widmar in the first half of 2019 about the dismantling of the Project Development division. CW2 further noted that in early 2019, the division was laying people off and that Project Development team members were told about discussions with managers regarding who would be let go or kept on. CW2 reported that if a team member was not assigned to an ongoing project, they were terminated.

171.   CW6 reported that he heard in late 2018 or early 2019 that the Project Development division was being shut down.

### a. First Solar's False and Misleading Proxy Statement

172.   On April 15, 2022, the Company filed its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect all of the Individual Defendants to the Board. The Proxy Statement was issued by the order of the Board and signed by Defendant Widmar.

-41-

173.   The 2022 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

**The Board's Role in Risk Oversight**

We have a comprehensive risk management process in which management is responsible for identifying and managing the Company's risks, and the board of directors and its committees provide oversight in connection with these efforts. Risks are identified, assessed, and managed on an ongoing basis and communicated to management during periodic management meetings or otherwise, as appropriate. Existing and potential material risks are addressed during periodic senior management meetings, resulting in both board and committee discussions. In addition, risk assessment is embedded in our business decision-making, business planning, budgeting, and strategic planning.

The board of directors is responsible for overseeing management in the execution of its risk management responsibilities and for assessing the Company's approach to risk management. The board of directors administers this risk oversight function either through the full board or through one of its four standing committees, each of which examines various components of the Company's enterprise risks as part of its responsibilities. The full board reviews enterprise-wide strategic risks and certain other higher risk areas on a regular basis. An overall review of risk is inherent in the board's consideration of our long-term strategies and in the transactions and other matters presented to the board of directors, including capital expenditures, manufacturing capacity expansions, acquisitions, budgeting, and significant financial matters.

174.   The 2022 Proxy Statement represents that management "regularly reports on risk-related matters to the board of directors or the relevant committee thereof. Further, the 2022 Proxy Statement represents that "[m]anagement presentations containing information regarding risks and risk management initiatives are given throughout the year in connection with quarterly and special board and committee meetings as well as other communications as needed or as requested by the board of directors or its committees."  Further, the "director of internal audit reports to the audit committee [quarterly] and has open access to the chair of the audit committee."

175.   The 2022 Proxy Statement represents that the Company has robust corporate governance based on the expertise of the Board:

Our board of directors comprises members who have held numerous public and

private company directorships, as well as CEO, CFO, COO, and other senior executive positions. Through this, they have gained expertise in strategic planning, business development, risk management, and corporate governance.

\*\*\*

Collectively, the diverse skills of our board of directors, their lengthy business and governance experience, and a complementary mix of longer-tenured directors possessing industry and institutional history together with more recently tenured directors who provide new viewpoints, allows for informed discussions and thoughtful decision making by the board.

176.   The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division.

177.   On May 27, 2022, First Solar filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of the Individual Defendants, pursuant to the solicitation in the 2022 Proxy Statement.

**b.   Defendant Widmar Financially Benefited From Insider Trades And Performance-Based Compensation**

178.   On April 1, 2020, the Company filed its 2020 proxy statement with the SEC. The 2020 proxy statement disclosed that First Solar's executive officers, including Defendant Widmar, participated in an Executive Performance Equity Plan ("EPEP"). According to the 2020 Proxy, the EPEP is a "a long-term incentive program for key executive officers and associates first implemented in 2017," and is "intended to reward the achievement of performance objectives that align with our long-term strategic plans,

*including the continued execution of our Series 6 module technology*, which commenced in 2018." The 2020 Proxy describes the EPEP:

> In 2019, the compensation committee approved grants of performance stock units ("PSUs") to be earned over an approximately three-year performance period ending in December 2021. These grants of PSUs, which are intended to represent the largest component of our executives' potential compensation, *are based on four performance metrics, including our Series 6 cost per watt produced, Series 6 watts per module,* total company gross profit, and total company operating income. In designing the 2019 EPEP awards, the compensation committee determined that the selected performance metrics align the interests of our executives with our stockholders by focusing management's attention on core enablers of long-term competitiveness, *such as module costs* and company profitability.

179.   Defendant Widmar financially benefited from insider trades based on their possession of material, adverse, nonpublic information regarding the ongoing problems with the Series 6 modules and the poor performance of the Project Development division.

180.   Defendant Widmar made the following improper insider sales of First Solar stock during 2019, reaping nearly $8 million dollars:

| Date of Sale | Shares | Proceeds |
|---|---|---|
| 2/25/2019 | 51,473 | $2,765,644.29 |
| 3/5/2019 | 1,542 | $80,476.98 |
| 3/6/2019 | 3,875 | $199,058.75 |
| 3/7/2019 | 9,033 | $454,901.88 |
| 3/8/2019 | 1,997 | $102,166.52 |
| 4/10/2019 | 33,371 | $2,002,260.00 |
| 7/1/2019 | 2,722 | $180,005.86 |
| 8/5/2019 | 34,964 | $2,147,737.08 |
| **Total** | **138,977** | **$7,932,251.36** |

## VI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

181.   Plaintiff brings this action derivatively and for the benefit of First Solar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants'

breaches of their fiduciary duties as directors and/or officers of First Solar, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

182.   First Solar is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

183.   Plaintiff is, and has been at all relevant times, a stockholder of First Solar and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of First Solar in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

184.   Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

**A.**     **Demand Upon Defendant Ahearn Is Excused**

185.   Defendant Ahearn previously served as First Solar's chief executive officer from August 2000 to September 2009; interim chief executive officer from October 2011 to May 2012; executive chairman from October 2009 to December 2010 and May 2012 to July 2012; and non-executive chairman from January 2011 to October 2011 and July 2012 to present.  Defendant Ahearn therefore is not independent.  Indeed, First Solar's 2022 Proxy Statement does not list Ahearn as an independent director.

186.   Ahearn received $385,221 in 2021 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Ahearn earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey,

the median director compensation per year at a large cap company like First Solar[21] is $294,000, about 27% less than that paid to Ahearn.

187.   Defendant Ahearn will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of March 31, 2022, Ahearn held 144,391 shares of First Solar common stock.  If Ahearn admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued.   Further, if Ahearn acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company as an officer and director, either knew of the wrongdoing or should have known of the wrongdoing.

188.   Ahearn authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

189.   Ahearn benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

190.   Ahearn has long-standing business relationship with Defendant Chapman which precludes him from acting in an independent and disinterested manner. Defendant Ahearn and Defendant Chapman are both closely connected to the Walton family, long-term investors in First Solar.[22] In 1996, John Walton and his close friend, Defendant Ahearn, established an equity investment/venture capital company called True North Partners, eventually changing the company's name to JWMA Partners.[23] In 1999,

---

[21]   The FW Cook survey defines a large cap company as one with a market capitalization of $10 billion or greater.

[22]   Walmart invested $25 million in First Solar in 2008.

[23]   Benjamin Harle, *Walton Family Net Worth, Finance Friday*, May 28, 2021, https://thefinancefriday.com/2021/05/28/walton-family-net-worth/.

1    JWMA acquired First Solar. JWMA invested millions into First Solar, growing it into

2    one of the largest solar cell producers.[24]  In 2011, Ahearn started a successor venture

3    capital firm called True North Venture Partners, L.P. ("True North Venture") and Lukas

4    Walton, John Walton's son, became Ahearn's right-hand man at the firm. Lukas Walton

5    still holds almost 5% of the Company.

6         191.   Chapman serves as an advisor to Walton Enterprises, Inc. ("Walton

7    Enterprises"), where he has worked since 1983, most recently as CFO of the company.

8    Chapman oversaw all aspects of the Walton Family Office in Arkansas. Chapman also

9    serves on the board of the Walton Family Charitable Support Foundation. Chapman was

10   previously a member of JWMA and the Board of Managers of First Solar Holdings,

11   LLC before the Company went public. Chapman is on the board of Arvest Bank Group

12   with Jim Walton, John Walton's brother, who serves as Chair.

13        192.   Ahearn has long-standing business relationships with Defendant Hambro

14   and Defendant Kennedy that prevent him from acting in a disinterested and independent

15   manner. Ahearn is the founder, Managing Partner and Chairman of True North Venture.

16   Hambro is an operating partner at True North Venture. Hambro also sits on the board of

17   Aquahydrex, a portfolio company of True North Venture. Kennedy serves on the

18   advisory board of True North Venture.

19        193.   Ahearn, as a director of First Solar, was required to, but failed to: (1)

20   implement and maintain an effective system of internal controls to ensure that the

21   Company was complying with all laws, rules, and regulations governing First Solar's

22   core operations and making truthful, accurate, and complete statements to investors and

23   customers; (2) effectively oversee the material risks facing the Company; and (3)

24   investigate and take action when presented with red flags in connection with the

25

---

26   [24]    John Walton passed away in 2005 after investing more than $150 million in First Solar
     at Ahearn's urging. At one point, John Walton's estate, through JWMA, was the largest First
27   Solar shareholder.

Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Ahearn taken timely action, the damage caused to First Solar could have been prevented or minimized.

194.   Ahearn is neither disinterested nor independent. Any demand upon Defendant Ahearn is futile and, thus, excused.

**B.   Demand Upon Defendant Chapman Is Excused**

195.   Defendant Chapman will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Chapman held 30,988 shares of First Solar common stock. Chapman received $260,176 in compensation in the form of fees and stock and option awards for his service as a director in 2021. If Chapman admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued and his lucrative position jeopardized. Further, if Chapman acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

196.   Chapman authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

197.   Chapman benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

198.   Chapman has a long-standing business relationship with Defendant Ahearn which precludes him from acting in an independent and disinterested manner. Defendant Ahearn and Defendant Chapman are both closely connected to the Walton family, long-time investors in First Solar. In 1996, John Walton and his close friend, Defendant Ahearn, established an equity investment/venture capital company called

True North Partners, eventually changing the company's name to JWMA Partners for legal reasons. In 1999, JWMA acquired First Solar. JWMA investing millions into First Solar, growing it into one of the largest solar cell producers. In 2011, Ahearn started a successor venture capital firm called True North Venture Partners and Lukas Walton, John Walton's son, became Ahearn's right-hand man at the firm. Lukas Walton inherited a large stake in First Solar and still holds almost 5% of the Company.

199.    Chapman serves as an advisor to Walton Enterprises, where he has worked since 1983, most recently as CFO of the company. Chapman oversaw all aspects of the Walton Family Office in Arkansas. Chapman also serves on the board of the Walton Family Charitable Support Foundation. Chapman was previously a member of JWMA and the Board of Managers of First Solar Holdings, LLC before the Company went public. Chapman is on the board of Arvest Bank Group with Jim Walton, John Walton's brother, who serves as Chair.

200.    Chapman worked for Pricewaterhouse Coopers LLP, the Company's purportedly independent auditors, for about seven years.

201.    Chapman, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Chapman taken timely action, the damage caused to First Solar could have been prevented or minimized.

202.    Chapman, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and First Solar's compliance with relevant laws, rules, and regulations. Chapman utterly failed to perform these essential duties.

203.   Chapman is neither disinterested nor independent.  Any demand upon Defendant Chapman is futile and, thus, excused.

**C.   Demand Upon Defendant George Is Excused**

204.   Defendant George will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of March 31, 2022, George held 1,220 shares of First Solar common stock.  George received $130,100 in compensation in the form of fees and stock option awards for her service as a director in 2021. If George admitted that she, First Solar, or others engaged in misconduct, her investment in First Solar would be substantially devalued and her lucrative position jeopardized. Further, if George acknowledged that executives at First Solar had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

205.   George authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

206.   George benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

207.   George, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding

-50-

the Company's Project Development division. Had George taken timely action, the damage caused to First Solar could have been prevented or minimized.

208.    George failed to uphold her additional obligations as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

209.    George is neither disinterested nor independent. Any demand upon Defendant George is futile and, thus, excused.

**D.      Demand Upon Defendant Hambro Is Excused**

210.    Defendant Hambro will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Hambro held 22,988 shares of common stock. Hambro received $275,176 compensation in the form of fees and stock option awards for his service as a director in 2021.  If Hambro admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued and his lucrative position jeopardized. Further, if Hambro acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

211.    Hambro authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

212.    Hambro benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

213.    Hambro has a long-standing business relationship with Defendant Ahearn and Defendant Kennedy which precludes him from acting in an independent and

disinterested manner. Ahearn is the founder, Managing Partner, and Chairman of True North Venture. Hambro is an operating partner at True North Venture. Hambro also sits on the board of Aquahydrex, a portfolio company of True North Venture. Kennedy serves on the advisory board of True North Venture.

214.   Hambro, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Hambro taken timely action, the damage caused to First Solar could have been prevented or minimized.

215.   Hambro is neither disinterested nor independent.  Any demand upon Defendant Hambro is futile and, thus, excused.

**E.    Demand Upon Defendant Joseph Is Excused**

216.   As of March 31, 2022, Joseph held 12,519 shares of First Solar common stock.  Joseph received $325,176 compensation in the form of fees and stock option awards for his service as a director in 2021. Joseph earns compensation in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like First Solar is $294,000, about 10% less than that paid to Joseph.

217.   Defendant Joseph will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments. If Joseph admitted that she, First Solar, or others engaged in misconduct, her investment in First Solar would be substantially devalued. Further, if Joseph

acknowledged that executives at First Solar had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

218.   Joseph authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

219.   Joseph benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

220.   Joseph has a long-standing business relationship with Defendant Wright which precludes her from acting in an independent and disinterested manner. Joseph is CEO of UnitedHealthcare Global and Executive Vice President, Global, UnitedHealth Group. She also serves on UnitedHealthcare's Executive Council and UnitedHealth Group's Executive Leadership Team. Wright is the Executive Vice President and the Chief Customer Experience Officer of UnitedHealth Group. Wright is also a director of UnitedHealth Foundation, an arm of UnitedHealth Group.

221.   Joseph, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Joseph taken timely action, the damage caused to First Solar could have been prevented or minimized.

222.    Joseph, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and First Solar's compliance with relevant laws, rules, and regulations.  Joseph utterly failed to perform these essential duties.

223.    Joseph failed to uphold her additional obligations as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

224.    Joseph is neither disinterested nor independent. Any demand upon Defendant Joseph is futile and, thus, excused.

**F.    Demand Upon Defendant Kennedy Is Excused**

225.    Kennedy will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of March 31, 2022, Kennedy held 22,197 shares of common stock.  Kennedy received $260,176 compensation in the form of fees and stock option awards for his service as a director in 2021. If Kennedy admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued and his lucrative position jeopardized. Further, if Kennedy acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

226.    Kennedy has long-standing business relationships with Defendant Ahearn and Defendant Hambro which precludes him from acting in an independent and disinterested manner. Kennedy serves on the advisory board of True North Venture. Ahearn is the founder, Managing Partner, and Chairman of True North Venture. Hambro is an operating partner at True North Venture. Hambro also sits on the board of Aquahydrex, a portfolio company of True North Venture.

227.   Kennedy authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

228.   Kennedy benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

229.   Kennedy, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Kennedy taken timely action, the damage caused to First Solar could have been prevented or minimized.

230.   Kennedy, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and First Solar's compliance with relevant laws, rules, and regulations.  Kennedy utterly failed to perform these essential duties.

231.   Kennedy is neither disinterested nor independent.  Any demand upon Defendant Kennedy is futile and, thus, excused.

**G.     Demand Upon Defendant Kro Is Excused**

232.   Defendant Kro will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of March 31, 2022, Kro held 2,258 shares of First Solar common stock. If Kro admitted that she, First Solar, or others engaged in misconduct, her investment in First Solar would be substantially devalued and her lucrative position jeopardized. Further, if Kro acknowledged that executives at First Solar had engaged in the

wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

233.    Kro benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

234.    Kro, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Kro taken timely action, the damage caused to First Solar could have been prevented or minimized.

235.    Kro is neither disinterested nor independent.   Any demand upon Defendant Kro is futile and, thus, excused.

**H.     Demand Upon Defendant Post Is Excused**

236.    Defendant Post will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of March 31, 2022, Post held 32,841 shares of common stock.  Post received $260,176 compensation in the form of fees and stock option awards for his service as a director in 2021.  If Post admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued and his lucrative position devalued. Further, if Post acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

237.   Post authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

238.   Post benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

239.   Post, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Post taken timely action, the damage caused to First Solar could have been prevented or minimized.

240.   Post failed to uphold his duties as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

241.   Post is neither disinterested nor independent.   Any demand upon Defendant Post is futile and, thus, excused.

**I.      Demand Upon Defendant Stebbins Is Excused**

242.   Defendant Stebbins will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Stebbins held 34,906 shares of common stock. Stebbins received $275,176 compensation in the form of fees and stock option awards for his service as a director in 2021. If Stebbins admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued and his lucrative position jeopardized. Further, if Stebbins acknowledged that executives

at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

243.   Stebbins authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

244.   Stebbins benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

245.   Stebbins, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Stebbins taken timely action, the damage caused to First Solar could have been prevented or minimized.

246.   Stebbins, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and First Solar's compliance with relevant laws, rules, and regulations.  Stebbins utterly failed to perform these essential duties.

247.   Further, Stebbins failed to uphold his duties as Chair of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

248.   Stebbins is neither disinterested nor independent. Any demand upon Defendant Stebbins is futile and, thus, excused.

**J.    Demand Upon Defendant Sweeney Is Excused**

249.    Sweeney will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Sweeney held 31,781 shares of common stock. Sweeney received $285,176 compensation in the form of fees and stock option awards for his service as a director in 2021.   If Sweeney admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued and his lucrative position jeopardized. Further, if Sweeney acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

250.    Sweeney authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

251.    Sweeney benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

252.    Sweeney, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Sweeney taken timely action, the damage caused to First Solar could have been prevented or minimized.

253.   Further, Sweeney failed to uphold his duties as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

254.   Sweeney is neither disinterested nor independent.  Any demand upon Defendant Sweeney is futile and, thus, excused.

**K.     Demand Upon Defendant Widmar Is Excused**

255.   Defendant Widmar is CEO of First Solar and therefore is not independent. Indeed, First Solar's 2022 Proxy does not list Widmar as an independent director.

256.   The Company provides Defendant Widmar with his principal occupation from which he receives substantial compensation. Widmar's total compensation was $6,542,454 in 2021 and $8,317,673 in 2020. Thus, Widmar could not consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

257.   Widmar will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Widmar held 127,748 shares of common stock. If Widmar admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued. Further, if Widmar acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that he, as CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

258.   Widmar signed the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

259.   Defendant Widmar is named as a defendant in the pending Securities Class Action.   As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

260.   Widmar, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Widmar taken timely action, the damage caused to First Solar could have been prevented or minimized.

261.   As alleged herein, Widmar sold close to $8 million of First Solar stock while in possession of material non-public information about the issues with the new Series 6 modules and the poor performance of the Company's Project Development division pursuant to which he received direct financial benefits not shared with all other First Solar shareholders. Widmar financially benefitted from the misconduct alleged herein and as such is neither independent nor disinterested.

262.   Widmar is neither disinterested nor independent.   Any demand upon Defendant Widmar is futile and, thus, excused.

**L.   Demand Upon Defendant Wright is Excused**

263.   Wright will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm his and his investments.  As of March 31, 2022, Wright held 2,258 shares of First Solar common stock.  If Wright admitted that he, First Solar, or others engaged in misconduct, his investment in First Solar would be substantially devalued.  Further, if Wright acknowledged that executives at First Solar had engaged in the wrongdoing alleged, he would be acknowledging that

he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

264.    Wright has a long-standing business relationship with Defendant Joseph which precludes him from acting in an independent and disinterested manner.  Wright is the Executive Vice President and the Chief Customer Experience Officer of UnitedHealth Group. Wright is also a director of UnitedHealth Foundation, the philanthropic arm of UnitedHealth Group. Joseph is CEO of UnitedHealthcare Global and Executive Vice President, Global, UnitedHealth Group. She also serves on UnitedHealthcare's Executive Council and UnitedHealth Group's Executive Leadership Team.

265.    Wright benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the First Solar Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

266.    Wright, as a director of First Solar, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding the Company's Project Development division. Had Wright taken timely action, the damage caused to First Solar could have been prevented or minimized.

267.    Wright is neither disinterested nor independent. Any demand upon Defendant Widmar is futile and, thus, excused.

**M.     Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

268.    First Solar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

269.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

270.    Publicly traded companies, such as First Solar, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover First Solar's damages.

**VII.   CLAIMS FOR RELIEF**

<u>**COUNT ONE**</u>

**Against the Individual Defendants for**

**Violations of Section 14(a) of the Exchange Act**

271.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

272.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does

not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

273.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

274.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

275.   The 2022 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing First Solar's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's recurring issues with the Series 6 modules and public statements regarding theCompany's Project Development division.

276.    The misleading information contained in the 2022 Proxy Statement was material to First Solar's shareholders in determining whether to elect each of the Defendants to the Board.

277.    The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

278.    Plaintiff, on behalf of First Solar, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of the members of the Board.

## COUNT TWO

### Against the Individual Defendants for Breach of Fiduciary Duties

279.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

280.    The Individual Defendants owed and owe fiduciary duties to First Solar. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe First Solar the highest obligation of good faith and loyalty in the administration of First Solar's affairs, including assuring that First Solar complied with state and federal laws governing, among other things, the making of truthful, complete, and accurate public statements regarding the Company's financial condition and business prospects. The Board also had specific duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to First Solar alleged herein.

281.    The Individual Defendants ignored their duties.    The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

282.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of First Solar in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of First Solar's affairs and in the use and preservation of First Solar's assets.

283.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, First Solar has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending securities class action lawsuit.

284.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT THREE

### Against the Individual Defendants for Contribution and Indemnification

285.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

286.   The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

287.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

## COUNT FOUR

### Against the Individual Defendants for Aiding and Abetting

288.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

289.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

290.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

291.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

292.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## COUNT FIVE

### Against the Individual Defendants for Gross Mismanagement

293.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

294.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

295.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

296.   During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of First Solar and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(c)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to First Solar;

(d)   Declaring that the Individual Defendants have grossly mismanaged First Solar;

(e)   Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight;

(f)   Determining and awarding to First Solar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(g)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)     Awarding First Solar restitution from the Individual Defendants, and each of them;

(i)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(j)     Granting such other and further relief as the Court may deem just and proper.

## IX.     JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED: September 13, 2022                Respectfully submitted,

**MCKAY LAW, LLC**

_/s/ Michael C. McKay_
Michael C. McKay
5635 N. Scottsdale Road, Suite 117
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Facsimile: (480) 348-3999
Email: mmckay@mckaylaw.us

David C. Katz (*pro hac vice* anticipated)
Mark D. Smilow (*pro hac vice* anticipated)
Joshua M. Rubin (*pro hac vice* anticipated)
**WEISS LAW**
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
Email: msmilow@weisslawllp.com
Email: jrubin@weisslawllp.com
*Attorneys for Max Federman*

## **VERIFICATION**

I, Max Federman, hereby verify that I have held stock in First Solar, Inc. ("First Solar" or the "Company") at all times relevant hereto. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of First Solar. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

*Max Federman*

Max Federman (Sep 9, 2022 11:10 CDT)

Max Federman